UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

MARK ALAN ROUX,            )
                                     )
         Plaintiff,        )
                                     )
v.                          )        4:14 CV 1856 JMB
                                     )
CAROLYN COLVIN,         )
                                     )
         Defendant.     )

**MEMORANDUM AND ORDER**

Mark Alan Roux ("Plaintiff") appeals the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability benefits under the Social Security Act. 42 U.S.C. § 401 *et seq.* This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g), along with the consent of the parties under 28 U.S.C. § 636(c). Because the final decision of the Commissioner is supported by substantial evidence as explained below, the decision is affirmed.

I.     **Procedural and Factual Background**

Plaintiff is a 45 year-old man alleging disability due to various back, coronary, and mental health issues. (Tr. 41) Plaintiff filed this application for disability benefits on August 1, 2011. (Tr. 188) His application was denied on September 28, 2011. (Tr. 189) Thereafter, Plaintiff filed a written request for a hearing on the matter, which was held on February 26, 2013.[1] (Tr. 80- 132) At that hearing, Plaintiff (with counsel) testified concerning his physical and mental impairments, his previous work, and his daily activities. Several medical experts and a vocational expert ("VE") testified as well. After the hearing, the ALJ found Plaintiff not

---

[1] There were actually two hearings conducted in this case. At the initial hearing, the physician who was to testify as to Plaintiff's physical impairments received the wrong medical records. (Tr. 84-85) Thus, the ALJ scheduled a supplemental hearing to take testimony from a new medical expert on June 20, 2013. (Tr. 136-57)

disabled, and the Appeals Council denied review of that decision on September 12, 2014. (Tr. 1-4)  Plaintiff timely appealed that decision.

In Plaintiff's application, he alleged disability due to back pain, ankylosing spondylitis, various coronary issues, and mental impairments such as depression and anxiety. (Tr. 41)  It appears that many of Plaintiff's impairments date to around 2008, when Plaintiff suffered multiple heart attacks. (Tr. 66)  The contemporaneous medical evidence in the case indicates that some back issues were evident from around that time as well.  For example, in December 2008, imaging of the lumbar spine found osteoarthritis with spur formation from L1 through L5, and narrowing of the disc space between L1-L2, L2-L3, L3-L4, and L5-S1. (Tr. 455)

During this time, Plaintiff worked unloading coal trains for Midland Railway Supply, but Plaintiff's symptoms apparently continued to get worse, and he was put on medical leave.  His employment was eventually terminated in August of 2008. (Tr. 56, 95)

Since 2008, Plaintiff has been treated for his various illnesses by two treating physicians.  Dr. Yusef Chaudhry, M.D., is Plaintiff's primary care physician; and Dr. Jung H. Lee, M.D., is Plaintiff's cardiologist.

It appears that Plaintiff's back issues have become generally worse over time, but not consistently so.  For example, in June, 2010, Dr. Chaudhry noted minimal issues with Plaintiff's back.  A physical examination was unremarkable, and Plaintiff's spine was "normal," with full range of motion; and no evidence of neurological deficits. (Tr. 460)  But by August of 2011, the evidence was more mixed.  Plaintiff's lower back had "normal curvature" but straight leg raising tests were positive at 45 degrees with a limited range of motion, secondary to pain.[2] (Tr. 480-81)  A few months later, Plaintiff was diagnosed with ankylosing spondylitis, an inflammatory

[2]        Around this timeframe, Plaintiff was also diagnosed with:  (1) non-insulin dependent diabetes, which is treated with oral medication; (2) anxiety, which is treated with Xanax; and (3) ischemic heart disease, which is treated with Metoprolol. (Tr. 483)

disease that can cause vertebrae in the spine to fuse together, making the spine less flexible, and resulting in lower back pain.[3]

Further imaging and physical examinations over the next year and a half continued to show impairments of the lumbar spine.  (See, e.g., Tr. 616, 629)  But some of the findings indicated less severe impairments.  For example, on May 23, 2013, Dr. Chaudhry's physical examination showed cervical para-spinal muscle spasm without neurological deficits, and cervical x-rays were normal.  (Tr. 653)

Meanwhile, Plaintiff's coronary issues seem to have consistently improved with time.  As noted above, Plaintiff suffered a series of heart attacks in March of 2008.  But by February of 2012, Dr. Lee, a cardiologist, noted that Plaintiff was "doing well from a cardiac standpoint," and a contemporaneous echocardiogram ("EKG") test was normal.  (Tr. 571, 627-28)

Plaintiff's alleged mental impairments include anxiety and depressive disorder.  (Tr. 37) Plaintiff's symptoms were evidently never severe enough for him to seek treatment specifically for his mental impairments, and he never saw a specialist for treatment.  Most of the evidence for mental impairments comes from Plaintiff's own testimony, which, as discussed in more detail below, includes mild restrictions in the activities of daily living, and moderate difficulties in social functioning.  For example, Plaintiff testified at the 2013 hearing that he is able to attend church, watch television, do laundry, vacuum, and do shopping and driving, but he also testified that he has no friends.  (Tr. 103-109)  It appears that he is able to live and function mostly independently.  Finally, there is some evidence that Plaintiff suffers from limitations regarding his memory and ability to concentrate.  Indeed, Plaintiff testified that his memory and concentration have declined such that he "couldn't remember peoples' names."  (Tr. 107)

_____

[3]        Dr. Hamid Bashir, M.D., a rheumatologist, also examined Plaintiff.  On November 17, 2011, Dr. Bashir's examination revealed decreased cervical and lumbar spine range of motion with positive Shober test.  Dr. Bashir concurred with Plaintiff's diagnosis of ankylosing spondylosis.  (Tr. 581-82)

As discussed in more detail below, multiple doctors have opined on Plaintiff's ailments during the course of this case. Dr. Thomas J. Spencer, Psy.D., performed a psychological evaluation of Plaintiff on August 1, 2011. Dr. Michael Cremerius, Ph.D., a non-examining consulting psychologist reviewed the medical records and opined on Plaintiff's mental impairments. Dr. Mark Farber, M.D., a non-examining consulting medical doctor opined on Plaintiff's physical impairments. The Court will address the substance of these findings, and undertake a more detailed analysis of the medical evidence in its discussion of the arguments of the parties, below.

## II.     Issues Before the Court

The general issue in this case is whether the decision of the Commissioner is supported by substantial evidence. More particularly, the parties dispute whether:

- the ALJ properly considered Plaintiff's alleged impairment of insomnia, and whether his insomnia was severe;
- the medical consultant the ALJ appointed was qualified;
- the ALJ properly considered a State Agency physician's finding of impairment;
- the ALJ considered the side effects of Plaintiff's medications;
- the ALJ improperly discounted the treating physician's testimony;
- the ALJ erred at Step Three in failing to find Plaintiff's impairments met or medically equaled a Listing; and
- the ALJ's RFC failed to include additional limitations relating to concentration, memory, Plaintiff's need to elevate his legs, and take unscheduled/excessive breaks.

## III.    Standard of Review

This Court reviews the final decision of the Commissioner to ensure that it is supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); and Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994). Substantial evidence is "less than a preponderance but is enough that a reasonable mind would find it adequate to support the commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2003). Thus, the

Commissioner's decision may not be reversed solely because this Court might have decided the case differently. Id. at 1022. Instead, a reviewing Court must determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the Commissioner's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).

Additionally, this Court will review the Commissioner's decision for legal error in applying the required five-step process to determine disability status. See 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process). Steps One through Three require Plaintiff to prove: (1) he is not currently engaged in substantial gainful activity; (2) he suffers from a severe impairment; and (3) his disability meets or equals a listed impairment. If Plaintiff does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether Plaintiff retains the residual functional capacity ("RFC") to perform his previous work. If Plaintiff proves he cannot do so, then the burden switches to the Commissioner at Step Five to prove that there is work in the national economy that Plaintiff can do, considering his age, work experience, education, and RFC. Id.

**IV.**  **Discussion**

As noted above, the parties in this case dispute whether:

- the ALJ properly considered Plaintiff's alleged impairment of insomnia, and whether his insomnia was severe;
- the medical consultant the ALJ appointed was qualified;
- the ALJ properly considered a State Agency physician's finding of impairment;
- the ALJ considered the side effects of Plaintiff's medications;
- the ALJ improperly discounted the treating physician's testimony;
- the ALJ erred at Step Three in failing to find Plaintiff's impairments met or medically equaled a Listing; and
- the ALJ's RFC failed to include additional limitations relating to concentration, memory, Plaintiff's need to elevate his legs, and take unscheduled/excessive breaks.

## A.  **Plaintiff's Credibility**

Before discussing the several issues listed above, the Court will analyze the ALJ's treatment of Plaintiff's credibility, because that question is inextricably intertwined with many, if not all, of the issues below that are articulated by the parties.

In evaluating Plaintiff's credibility regarding pain or symptom severity, ALJs are required to:  (1) determine whether there is an underlying medically determinable physical or mental impairment that can reasonably be expected to produce the Plaintiff's pain or other symptoms; and then (2) evaluate Plaintiff's allegations concerning severity by using objective medical evidence and the factors laid out in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  In this case, the ALJ found that Plaintiff's allegations were "not credible."  (Tr. 41)

The ALJ's treatment of Plaintiff's credibility was in accordance with the law.  First, the ALJ specifically discussed many of the Polaski factors.  See Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting [a Plaintiff's] subjective complaints.").  For example, the ALJ analyzed Plaintiff's daily activities, concluding that they were inconsistent with allegations of total disability.  (Tr. 41)  Plaintiff testified at his February, 2013 hearing that his daily activities included attending church, watching television, doing laundry, vacuuming, shopping and driving.  (Tr. 103-09)  Plaintiff's Function Report demonstrated his ability to essentially live and function independently, provide for his own personal care, perform light household chores, go shopping, and drive a car.  Plaintiff advised that he attended school daily and went outside five days a week.  (Tr. 389-99)

Further, the ALJ noted that Plaintiff's treatment was often minimal, or conservative, which is inconsistent with allegations of complete disability.  Additionally, and as discussed in

more detail below, the ALJ noted that Plaintiff's medications were generally effective at symptom control, and did not produce significant side effects.  (Tr. 42)  Also in accordance with Polaski, the ALJ noted that there was no lay witness testimony providing significant independent evidence to support Plaintiff's allegations regarding disability, or symptom severity.  (Tr. 43)

Finally, the ALJ used objective medical evidence to support his finding that Plaintiff's allegations regarding severity were not fully credible.  (Tr. 42)  For instance, the ALJ noted that diagnostic findings showed degenerative disc disease at L1-S1, but without evidence of disc herniation or stenosis.  (Id.)  Regarding Plaintiff's coronary impairments, the ALJ noted that physical examinations revealed normal heart rate and rhythm without murmurs, gallops or rubs, and cardiac testing was "essentially normal."  (Id.)  Regarding hypertension, there was no evidence of elevated blood pressure readings on examination, and regarding diabetes, the evidence showed that it was "apparently well controlled" with medication, and there was no evidence of diabetic retinopathy, nephropathy, or neuropathy.  (Id.)

The ALJ's treatment of all of these considerations satisfies the requirements of Polaski for evaluating a Plaintiff's credibility.  The ALJ used the correct analysis, and substantial evidence supports his findings.  Thus, the ALJ's discounting of Plaintiff's credibility was in accordance with the law.  Because the credibility finding is well-supported, it is entitled to deference by this Court.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) ("Where adequately explained and supported, credibility findings are for the ALJ to make.").

**B.  Whether the ALJ properly considered Plaintiff's insomnia**

Plaintiff's first argument is that the ALJ erred because he did not find Plaintiff's insomnia to be a severe impairment, or did not otherwise account for insomnia's limitations on Plaintiff's

ability to work.  Also, Plaintiff argues that the ALJ failed to articulate reasons for his conclusions regarding Plaintiff's insomnia.

Defendant, on the other hand, argues that it is irrelevant whether the ALJ considered insomnia to be a severe impairment, because so long as the ALJ found at least one severe impairment, he had to move on to a consideration of whether Plaintiff met a Listing.  Defendant also argues that so long as the ALJ accounted for insomnia in the RFC, there is no reversible error.  Defendant then argues that the RFC is well-supported, and takes into account whatever limitations the insomnia might have imposed.

This Court agrees with Defendant that the question of whether insomnia qualified as "severe" at Step Two of the analysis is not relevant, so long as the ALJ considered its effects at Steps Three and Four, to the extent that those effects are documented in the record.  The Court also agrees that it is not the fact of diagnosis that is dispositive; it is the functional limitations that that diagnosis imposes.  See Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 731 (8th Cir. 2003) ("the dispositive question remains whether [Plaintiff's] functioning in various areas is markedly impaired, not what one doctor or another labels his disorder").

It appears to the Court that the ALJ concluded that Plaintiff's insomnia did not impose any functional limitations on Plaintiff above and beyond those already included in the RFC:  "all other documented impairments were minor or acute illnesses or injuries resulting in no significant long-term functional limitations or complications."  (Tr. 42)  This conclusion is supported by substantial evidence for several reasons.  First, the doctors to whom the ALJ accorded weight either disputed that Plaintiff's insomnia imposed limitations, or were highly skeptical of that possibility, as discussed below.  (E.g. Tr. 153-55)  Second, the only references to insomnia in the objective medical evidence are mere notations in Dr. Chaudhry's and Dr.

Lee's progress notes, with no analysis, or supporting medical evidence demonstrating the existence of the condition.

Plaintiff notes that Drs. Chaudhry and Lee both diagnosed insomnia (and Dr. Cremerius, and Dr. Farber acknowledged the existence of an insomnia diagnosis).  (Tr. 88, 153)  But Dr. Farber's testimony was equivocal.  Although he admitted that Plaintiff "probably has insomnia," he initially said only that Plaintiff "says he has trouble sleeping."  Dr. Farber was skeptical of the diagnosis because there was no "sleep study" or other objective medical evidence that would have supported a finding of insomnia.  Furthermore, Dr. Farber said that Plaintiff's complaints of fatigue were not evidence of insomnia because "most people with fatigue sleep too much" as opposed to suffering from insomnia.  (Tr. 153-155)

Dr. Cremerius, Ph.D., a licensed psychologist, did not mention insomnia when listing Plaintiff's limitations.  (Tr. 87-8)  When Plaintiff's attorney asked whether Plaintiff had insomnia, Dr. Cremerius allowed that Plaintiff may have insomnia, but he indicated that Plaintiff had no functional limitations that could be attributed to insomnia.  He concurred with Dr. Spencer that whatever functional limitations there were, were probably attributable to panic and depressive disorders.  (Tr. 88-9)  Dr. Cremerius went on to say that the insomnia did not exacerbate the panic and depressive disorders—there was nothing in the record to show any limitations from it.  (Tr. 90)

Meanwhile, Dr. Chaudhry indeed notes in several places a diagnosis of insomnia, but these notations are inconsistent, and where they do show up, Dr. Chaudhry merely states that fact, without pointing to any medical evidence in support.  For example, in August and October of 2010, Dr. Chaudhry notes the existence of insomnia, but in conclusory fashion, without citation to any medical evidence.  (Tr. 463, 464)  But two weeks later, in October of 2010, Dr.

Chaudhry does not note a finding of insomnia. (Tr. 466) Similarly, in August, 2011, Dr. Chaudhry notes without explanation that Plaintiff suffers from insomnia; (Tr. 481) but a month before, in July, Dr. Chaudhry said only that Plaintiff suffered from pain, anxiety, and ischemic heart disease.[4] (Tr. 479)

Similarly, Dr. Jung Lee, M.D., noted that Plaintiff suffers from "chronic insomnia," but Dr. Lee cites to no objective medical evidence for that finding—he simply says it. (Tr. 567) The same process repeats itself several times: Dr. Lee notes the presence of chronic insomnia, but cites no evidence. (Tr. 568, 69) Dr. Lee, a cardiologist, mentions heart issues in his progress notes but does not address insomnia in his treatment plans. (Id.)

Ultimately, the only medical source to address insomnia in anything other than a cursory fashion was Dr. Faber, who was equivocal at best when testifying about Plaintiff's insomnia. He was especially skeptical because there were no sleep studies or other objective medical evidence to support Plaintiff's testimony regarding the limiting nature of the insomnia.

Finally, Dr. Spencer performed a psychological evaluation of Plaintiff on August 1, 2011. He diagnosed Plaintiff with panic disorder without agoraphobia, depressive disorder, not otherwise specified, and major depressive order. Dr. Spencer made no mention of insomnia. (Tr. 548-52) Similarly, Scott Brandhorst, Psy.D., a non-examining state agency psychologist, made no reference to insomnia, saying that Plaintiff suffered from "anxiety" and "alcoholism." (Tr. 553-66)

Thus, the Court concludes that: (1) even though there were formal diagnoses of insomnia by Plaintiff's treating physicians, those diagnoses were conclusory, without citation to objective

---

[4]   It is not clear that all of Dr. Chaudhry's physical exams and/or paperwork were rigorously completed—some contain obvious errors. For example, during an appointment on January 6, 2012, Dr. Chaudhry supposedly conducted a physical examination of Plaintiff. Dr. Chaudhry's "findings" say that he inspected Plaintiff's vagina, cervix, adnexa, uterus and external genitalia. Dr. Chaudhry found all of them "normal"—notwithstanding the fact that the patient is a male. (Tr. 613-14)

medical evidence, and without discussion of functional limitations attributable to that disorder; (2) the doctors to whom the ALJ gave weight were skeptical of a diagnosis of insomnia and affirmatively stated that no functional limitations flowed from it; and (3) there appear to be no functional limitations from the insomnia specifically attributable to that diagnosis that are not already accounted for in the RFC for sedentary work.  Thus, if there was any error in failing to designate Plaintiff's insomnia as severe, the error was harmless because it would not have affected the ALJ's ultimate decision of whether Plaintiff was disabled.  See Byes v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012) (noting that an error is harmless unless the ALJ would have decided the case differently).

### C.  Whether the State Agency's medical consultant was qualified

Plaintiff next argues that the ALJ erred in not appointing a consulting medical expert who specialized in ankylosing spondylosis.  This argument is unavailing for several reasons.  First, Plaintiff cites no case law or regulations indicating that an ALJ must appoint specialist consultants.  The Court could not independently find any such authority, and it appears that the relevant regulations governing consulting examinations, § 404.1517, speak only in broad terms: "we may ask you to have one or more physical or mental examinations or tests … if we arrange for the examination or test, we will give you reasonable notice of the date, time, and place the examination or test will be given, and the name of the person or facility who will do it."  There is no mention of specialists.

Second, the source cited by Plaintiff, the Hearings, Appeals and Litigation Law (HALLEX) Manual is not binding on the Social Security Administration.  HALLEX is a guideline of propositions of law and procedures for internal use within the Office of Hearings and Appeals.  Such sources are not binding on government agencies.  See Schweiker v. Hansen,

450 U.S. 785, 789 (1981) (per curiam) (holding that another, similar internal procedure handbook, the Social Security Administration's Claims Manual "has no legal force").

Furthermore, Plaintiff cites no authority to show that HALLEX was even violated. The applicable provision of HALLEX reads: "The ALJ or designee must select the [medical examiner] whose expertise is most appropriate to the claimant's diagnosed impairment(s)." HALLEX 1-2-5-36.[5] Thus, Plaintiff's arguments that the state agency's medical consultant was not qualified are unavailing.

### D. Whether the ALJ properly considered a State Agency physician's finding of impairment

Plaintiff next argues that the ALJ erred by failing to properly address some conclusions of Dr. Thomas Spencer, Psy.D, an examining psychologist. Dr. Spencer performed a psychological evaluation of Plaintiff on August 1, 2011. In the last two sentences of his report, Dr. Spencer opined that Plaintiff:

> has a mental illness, one that at this time appears to interfere with his ability to engage in employment suitable for his age, training, experience, and/or education. The duration of the disability could exceed 12 months, but with appropriate treatment and compliance, prognosis likely improves.

(Tr. 552)

In his written decision, the ALJ does not specifically address these last two sentences. Plaintiff construes these two sentences to say that Dr. Spencer thought Plaintiff disabled and incapable of work.

As an initial matter, the Court notes that "an ALJ is not required to discuss every piece of evidence submitted." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). The Court recognizes,

---

[5]    The Court also notes that there is nothing in Dr. Chaudhry's background or education that plainly indicates he has a specialty more appropriate to treating ankylosing spondylosis than Dr. Farber's. Dr. Farber testified that this disease is usually treated by rheumatologists. (Tr. 146) Dr. Chaudhry is a general practitioner, not a rheumatologist, and his only documented experience with this disorder appears to be his treating of Plaintiff.

however, that those two sentences, at the end of Dr. Spencer's analysis, could be read to indicate that he thought Plaintiff was disabled. But in the context of all of Dr. Spencer's findings, as well as the medical and opinion evidence as a whole, the ALJ would be justified in concluding that Dr. Spencer did not mean to opine that Plaintiff was disabled, for several reasons.

First, all of Dr. Spencer's findings within that mental status examination are consistent with findings of mild or moderate mental impairments, as opposed to disabling limitations. Among the findings of Dr. Spencer were that Plaintiff was oriented, with no evidence of thought disorder, with a restricted affect and intact judgment and insight. Dr. Spencer diagnosed Plaintiff with panic disorder without agoraphobia, and depressive disorder—not otherwise specified, with a Global Assessment of Functioning Scale of 55-60, which indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. (Tr. 548-52)

Second, it is clear that the medical professionals who reviewed Dr. Spencer's report did not take Dr. Spencer to be opining that Plaintiff was disabled. Dr. Cremerius' testimony is a good example. Dr. Cremerius testified that Dr. Spencer's exam was the "most detailed review of psych symptoms and mental status." (Tr. 86) Dr. Cremerius then went on to detail many of Dr. Spencer's findings and the impairments indicated thereby; he then specifically opined that none of those limitations rose to the level of a Listing. (Tr. 87). Furthermore, Dr. Cremerius specifically "concurred" with many of Dr. Spencer's findings, and yet did not consider Plaintiff disabled. (See Tr. 89, 90)

Finally, Scott Brandhorst, Psy.D., (another non-examining state agency psychologist) also reviewed Dr. Spencer's findings. Dr. Brandhorst concluded that the claimant had either mild, or no significant mental impairment limitations. It is clear that the ALJ considered Drs.

Cremerius, Brandhorst, and Spencer to be in agreement, because he found that the latter two "corroborated" the findings of Dr. Cremerius that Plaintiff was not disabled. (Tr. 43)

Thus, while it would have been helpful had the ALJ specifically addressed these two sentences in Dr. Spencer's examination, the Court is convinced that the best reading of Dr. Spencer's conclusion was that it did not indicate disability.[6]

**E.  Whether the ALJ considered the side effects of Plaintiff's medications**

Plaintiff's next argument is that the ALJ erred by failing to consider the side effects from Plaintiff's medications. Plaintiff takes a long list of medications for his ailments. He takes Lorcet, Xanax, Lisinopril, Prozac, Metformin, Ranitidine, Metoprolol, Tricor, Lipitor, Claritin, Imdur, aspirin, fish oil, and Nitrostat. (Tr. 436-39)

In his decision, the ALJ found that there is "no evidence of record that [Plaintiff's] prescribed medication is not generally effective when taken as prescribed or that it imposes significant adverse side effects." (Tr. 42) Plaintiff argues that that finding is not supported by substantial evidence. Defendant, on the other hand, argues that the ALJ did consider the side effects from Plaintiff's medications, first by discounting the extent of the limitations by discounting Plaintiff's credibility, and second by accommodating some of the limitations that the ALJ found credible within the RFC.

The Court finds that the conclusion of the ALJ in this regard is supported by substantial evidence. As an initial matter, much of the evidence pertaining to medication side effects comes from Plaintiff's testimony at the hearing or in his function report. For instance, Plaintiff testified

---

[6]     Additionally, even if Dr. Spencer had intended those sentences to be an opinion that Plaintiff was totally precluded from work, the ALJ would not be bound by that determination, because a finding of disability  is a decision reserved to the Commissioner.  See Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (noting that the ultimate determination of disability is an administrative determination reserved to the Commissioner).

that his medications make him "drowsy."[7]  (Tr. 124)  But as discussed above, the ALJ properly discounted the credibility of Plaintiff in this matter, so it was proper for the ALJ to discount this particular evidence regarding medication side effects.

Plaintiff argues that Dr.'s Cremerius and Faber offered testimony consistent with Plaintiff's allegations about medication side effects.  That is not correct.  Dr. Cremerius found that Plaintiff suffered from at least some concentration, persistence and pace issues, but attributed this to Plaintiff's panic disorder and depressive disorder.  (Tr. 89)  Dr. Faber, meanwhile, responded to Plaintiff's direct question of whether the list of medications "would affect cognitive function," by simply saying:  "no."  (Tr. 154-55)  Plaintiff's attorney then challenged Dr. Faber's testimony that the medications do not cause side effects when "given in proper doses."  (Tr. 155)  Eventually, Dr. Faber said that some of them "might."  (Id.)

Thus, the ALJ's finding regarding side effects is supported by substantial evidence where, as here, Plaintiff's credibility was properly discounted and medical professionals opined that side effects would not be a significant issue.

In any event, the Court also agrees with Defendant that some moderate limitations in concentration, pace, or persistence, and some drowsiness, are adequately dealt with in the RFC. The ALJ included some restrictions in Plaintiff's RFC to account for these deficits when he limited Plaintiff to performing no more than "simple, repetitive work with no more than occasional interaction with the public, co-workers, or supervisors."  (Tr. 40)  Thus, any hypothetical error that remains is harmless because the outcome of the case would not have changed.  See Byes v. Astrue, 687 F.3d at 917.

---

[7]     Plaintiff also argues, however, that this drowsiness, or malaise, is a symptom of his ankylosing spondylitis, or even related to his insomnia.  (Tr. 149, 154)

**F.  Whether the ALJ improperly discounted the treating physician's testimony**

Next, Plaintiff argues that the ALJ improperly discounted the opinion evidence of Plaintiff's treating physician.  Plaintiff contends that the conclusions of Dr. Chaudhry—who opined that Plaintiff had exertional limitations that precluded full-time work—were consistent with the medical record.  Defendant argues that Plaintiff's treating physician offered conclusory observations which were contradictory and unsupported by the clinical evidence, and thus, that the ALJ properly discounted Dr. Chaudhry's opinions.

The Court notes that under the law, an ALJ must give "controlling weight" to a treating physician's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.  Wagner v. Astrue, 499 F.3d 842, 848-49 (8th Cir. 2007).  Further, even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight.  Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015).  A treating physician's opinion may be discounted where it provides conclusory statements only, or is inconsistent with the record, and may be discounted or disregarded where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions.  Id.

Here, the ALJ significantly discounted the opinions of Plaintiff's treating physician, Dr. Chaudhry.  (See Tr. 43) ("Very little weight is afforded the medical source statement of Dr. Chaudhry.")  Dr. Chaudhry completed a two page questionnaire on June 13, 2013, which was substantially in checklist form.  (Tr. 655-56)  In that form, Dr. Chaudhry concluded that Plaintiff could, among other things:

- Work two hours per day;
- Stand for thirty minutes at a time, and two hours total in a workday;

- Lift nothing on either a frequent, or occasional basis;
- Never bend or stoop,
- Occasionally manipulate his left hand; and
- Would occasionally have to elevate his lefts during an eight hour day.

The ALJ found that such severe restrictions were not supported by the objective medical evidence in this case. The law and substantial evidence support the ALJ's finding. Indeed, those restrictions were given in conclusory, checklist form, without citing to any objective medical evidence for support. Under <u>Papesh</u>, that is a proper basis upon which to discount that statement.

Additionally, the ALJ properly concluded that Dr. Chaudhry's own treatment notes never articulated such severe limitations, and the limitations in the medical source statement ("MSS") are inconsistent with other substantial medical evidence in the record that the ALJ properly gave weight to, including the testimony of Dr. Farber. <u>See</u> <u>Davidson v. Astrue</u>, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."); <u>see also</u>, <u>Papesh</u>, 786 F.3d at 1132 (noting that an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence.).

For example, as Dr. Farber noted in reviewing Dr. Chaudhry's opinions, the MSS of June, 2013 is inconsistent with Dr. Chaudhry's own treatment notes from three weeks earlier, at the end of May, 2013. On May 23, 2013, Dr. Chaudhry notes that a neurologic exam reveals "normal sensation," normal strength bilaterally, bilateral reflexes, and gait normal. Meanwhile, the spine is "unremarkable" and "fine" range of motion "without pain." (Tr. 652) Dr. Farber concluded that Dr. Chaudhry "says something when he fills out his form and other thing in his physical exam." (Tr. 145) Here, the ALJ properly discounted the cursory and checklist opinion evidence of Dr. Chaudhry in favor of the consistent and opposing testimony of Drs. Farber, and Cremerius, and the consistent and opposing evidence submitted by Drs. Spencer and Brandhorst.

**G.  Whether the ALJ erred at Step Three in failing to find disability**

Next, Plaintiff argues that the ALJ erred by failing to find that Plaintiff's impairments, either individually or in combination, failed to meet the requirements of Listing 14.09(D).  That Listing requires:

> D.  Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
> 1.  Limitation of activities of daily living.
> 2.  Limitation in maintaining social functioning.
> 3.  Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

In support of his argument, Plaintiff points to his own testimony of severe fatigue, fever, malaise, and involuntary weight loss.  Even if this Court accepts that testimony, Plaintiff cannot show that he has marked limitations in the activities of daily living, maintaining social functioning, or completing tasks due to concentration, persistence, or pace problems.  The ALJ's finding that Plaintiff suffered, at most, from mild and moderate difficulties in these areas is supported by substantial evidence.  It is buttressed by the findings of the State agency psychological consultant, who found no more than mild limitations in daily living, mild limitations in social functioning, and moderate limitations in concentration persistence, and pace.  (Tr. 561)  Similarly, Dr. Cremerius, to whom the ALJ properly granted weight, testified that the record showed no more than moderate limitations.  The medical experts additionally testified explicitly that Plaintiff did not have a mental or physical impairment that met or equaled the severity criteria of any listed impairment.  (Tr. 87-88, 144).  In fact, the only evidence arguably supporting more stringent limitations was Plaintiff's own testimony, which, as discussed above, the ALJ properly discounted.  Thus, the testimony of multiple, credible medical experts supplies substantial evidence for the ALJ's conclusion that Plaintiff did not meet a Listing.

### H. Whether the ALJ's RFC failed to include additional limitations relating to concentration, memory, Plaintiff's need to elevate his legs, and unscheduled/excessive breaks

Finally, Plaintiff argues that the ALJ erred at Step Five of the disability analysis in finding Plaintiff could perform other work because the ALJ failed to account for additional limitations relating to deficits of concentration and memory, the need to elevate his legs at waist level throughout the work day and the need for occasional unscheduled and excessive disruptions of both the work day and work week.

The ALJ indeed took some of these limitations into account, such as the deficits of concentration and memory, when he limited Plaintiff to no more than simple, repetitive work. See Howard v. Massanari, 255 F.3d 577, 581-82 (8th Cir. 2001) (noting that a finding of deficiencies of concentration, persistence or pace is properly accounted for with an RFC limiting a plaintiff to simple, routine, repetitive tasks). (Tr. 40) To the extent, however, that Plaintiff claims he needs more significant limitations, the evidence comes primarily from Plaintiff's own testimony. (See Tr. 119-124) (Plaintiff testified to difficulty standing, walking, bending, kneeling, his need to elevate both feet, the need to nap, shortness of breath, dizziness, drowsiness, and deficits in concentration.)

As noted above, however, the ALJ properly discounted Plaintiff's subjective assessment of his own limitations. Thus, the question is whether there is additional evidence in the record that would support these findings. Plaintiff argues that Dr. Chaudhry provides evidence for such limitations. (See e.g., Tr. 472, 655) (Dr. Chaudhry's MSS discusses findings of fatigue and Plaintiff's need to elevate his legs "occasionally.")

These arguments are similarly unavailing because, as noted above, the ALJ properly discounted Dr. Chaudhry's MSS because it was inconsistent with his own conservative treatment plan, other substantial medical opinions, and the record as a whole.

Finally, Plaintiff argues that Drs. Spencer and Cremerius offered evidence supportive of these additional limitations. In fact, Drs. Spencer and Cremerius only noted deficits in concentration, memory, persistence and pace issues (as opposed to the need to elevate legs and take excessive breaks) and these limitations are provided for in the RFC. Thus, the record does not support the additional limitations claimed by Plaintiff.

In declaring that Plaintiff could engage in other work, the ALJ relied on the testimony of a VE, who testified that considering Plaintiff's age, education, past work history, and RFC, jobs existed in substantial numbers in the regional and national economy. In posing his hypothetical question to the VE, the ALJ was not required to include these additional limitations, such as leg elevation and excessive breaks, because the ALJ did not find support for these additional limitations in the record. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.")

Here, the hypothetical question included all of Plaintiff's limitations found to exist by the ALJ and set forth in the ALJ's description of Plaintiff's RFC. Because the Court finds that the RFC is supported by substantial evidence, the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits. Martise, 641 F.3d at 927.

**V.**     **Conclusion**

For all of the above reasons, Plaintiff's arguments that the ALJ erred are unavailing.  The ALJ thoroughly evaluated the medical records in this case, and gave Plaintiff a full and fair hearing.  The ALJ's conclusions in this matter are supported by substantial evidence.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Administrative Law Judge in this matter is AFFIRMED.

A separate Judgment shall be entered this day.

/s/ ***John M. Bodenhausen***
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of October, 2015.